UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                    Case No. 19-CR-

TEDMUND BLANKSCHEIN,

Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Laura S. Kwaterski, Assistant United States Attorney, and the defendant, Tedmund Blankschein, individually and by attorney Christopher Donovan, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGE

2.    The defendant has also been charged in a one-count information, which alleges a violation of Title 18, United States Code, Section 371.

3.    The defendant voluntarily agrees to waive prosecution by indictment in open court.

4.    The defendant has read and fully understands the charge contained in the information.  He fully understands the nature and elements of the crime with which he

has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

5.      The defendant voluntarily agrees to plead guilty to the charge set forth in the Information, which is set forth in full as follows:

### THE UNITED STATES ATTORNEY CHARGES:

1.      Beginning by at least May of 2013 and continuing until at least May of 2017, in the State and Eastern District of Wisconsin, and elsewhere,

### TEDMUND BLANKSCHEIN

knowingly conspired with Albert Golant to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service ("IRS") of the U.S. Treasury Department in the ascertainment, computation, assessment, and collection of the revenue, namely federal income taxes of the defendant and Albert Golant's luxury vehicle brokerage businesses, WI Automotive T.R.U.S.T., Lease, Registration, and Consulting LLC, and DOT Automotive of WI LLC.

2.      To accomplish the goals of this conspiracy, Golant and Blankschein committed various overt acts in furtherance of the conspiracy, including filing and causing the filing of false federal income tax returns for WI Automotive T.R.U.S.T., Lease, Registration, and Consulting LLC, and DOT Automotive of WI LLC.

All in violation of Title 18, United States Code, Section 371.

6.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense charged in the Information. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts set forth in Attachment A to this plea agreement. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt. The information set forth in Attachment A is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a

2

full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines: 5 years and $250,000.   The count also carries a mandatory special assessment of $100, and a maximum of 3 years of supervised release.   The parties further recognize that a restitution order may be entered by the court.   The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 26 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statute as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.      The parties understand and agree that to sustain the charge of conspiring to defraud the United States, in violation of 18 U.S.C. § 371, as charged in the Information, the government must prove each of the following propositions beyond a reasonable doubt:

> First, that the conspiracy to defraud the United States for the purpose of impeding, impairing, obstructing, or defeating the lawful government functions of the Internal Revenue Service in the ascertainment, computation, assessment, or collection of federal income taxes, as charged in the Information, existed; and

> Second, that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and

> Third, that one of the conspirators committed an overt act in an effort to advance the goals of the conspiracy.

3

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

13.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the

4

guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

14. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

15. For purposes of determining the defendant's offense level under the sentencing guidelines for the Count in the Information, the parties agree that the tax loss associated with the defendant's criminal conduct is more than $3.5 million but less than $9.5 million.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable offense level for the offense charged in the Information is 28 as determined under Sentencing Guidelines Manual §§ 2T1.9(a), 2T1.1(a)(1), 2T1.1(b)(1), 2T1.1(b)(2), and 2T4.1(J).

## Role in Offense for Count One

17. The parties agree to recommend to the sentencing court that a two-level decrease be given for a minor role for the offense changed in the Information pursuant to Sentencing Guidelines Manual § 3B1.2(a).

5

## Acceptance of Responsibility

18.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

20.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

21.     The government agrees to recommend a sentence of no more than 36 months' imprisonment.

## Court's Determinations at Sentencing

22.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing

6

court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

23. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty pleas solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

24. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

25. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office upon request of the FLU during any period of

7

probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

26.     The defendant agrees to pay restitution to the Internal Revenue Service in the amount of $5,476,381.00, jointly with his co-conspirator Albert Golant. The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S WAIVER OF RIGHTS

27.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charge against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

8

c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he or she was persuaded of defendant's guilt beyond a reasonable doubt.

d.    At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.    At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

28.    The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

29.    The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

9

30.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## GENERAL MATTERS

31.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

32.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

33.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

### Further Action by Internal Revenue Service

34.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the assessment and collection of any additional tax, interest, and penalties due from the defendant or his businesses as a result of the defendant's conduct giving rise to the charges alleged in the information.

10

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

35.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter.  If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement.  The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.  If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

36.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth or referenced in this agreement, to induce the defendant to plead guilty.

11

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 8/12/20 19

TEDMUND BLANKSCHEIN
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 8-12-19

CHRISTOPHER DONOVAN
Attorney for Defendant

For the United States of America:

Date: 8/13/19

MATTHEW D. KRUEGER
United States Attorney

Date: 8/13/2019

LAURA S. KWATERSKI
Assistant United States Attorney

12

## Attachment A

***Background***: Since approximately 2005, Albert Golant, who is also known as Alex Golant ("Golant"), has been involved in the business of purchasing luxury vehicles in the United States and shipping them overseas to foreign buyers. These cars were generally shipped to individual buyers in China, Russia, and Africa. This was a very lucrative business. For example, a BMW X5 Luxury Crossover SUV, which costs $103,000 when purchased in the United States, will cost $330,000 in China. Golant's luxury vehicle sale/export businesses are WI Automotive T.R.U.S.T. Lease, Registration, and Consulting, LLC, which did business under the name Timeless Auto Group ("WI Automotive T.R.U.S.T."), DOT Automotive of WI, LLC ("DOT Automotive"), and Reliable Car Source ("Reliable").

Golant's businesses received funds to purchase vehicles from overseas customers either directly from the buyers or through "vehicle brokers," who act as customer intermediaries in the United States. Typically, Golant purchased the luxury vehicles after he had received the funds for the purchase. Once Golant, or others working on his behalf, purchased the luxury vehicles in the United States, Golant arranged for them to be shipped either directly overseas to the customer or to a vehicle broker, who was generally located on either the east or west coast. Luxury automobile manufacturers have attempted to curb such activity by establishing guidelines for dealerships to prevent salespersons at the dealerships from engaging in the practice. To circumvent these guidelines, Golant used "straw buyers" to purchase the vehicles. A straw buyer is an individual recruited to purchase luxury vehicles in his or her name and then transfer the title of the vehicle to Golant for export. Typically, Golant provided the straw buyer with a cashier's check to pay for the vehicle outright. After purchasing the vehicle, the straw buyer would sign over the title to Golant or one of his associates and the vehicle would be shipped overseas. Alternatively, Golant directed the straw buyer to finance the purchase of the vehicle in his or her name. Golant agreed to pay off the vehicle loan within months, after the straw buyer signs over the title for the vehicle to Golant or one of his associates. On some occasions, Golant paid off the loans obtained in the straw buyers' names in their entirety. On at least 50 occasions, Golant did not pay off the loans in the straw buyer's name, ultimately resulting in losses to the financial institutions.

Additionally, on some occasions Golant provided his straw buyers with false and fraudulent financing applications to present to the dealership when purchasing a luxury vehicle. Again, on some occasions, Golant paid off the loan in the straw buyer's name as promised. On other occasions, however, Golant paid off only a part of the loan in the straw buyer's name and then refused to make additional payments on the loan, causing losses to the banks and lenders. Golant's bank records reveal tens of millions of dollars in cashier's checks written to dozens of straw buyers Golant used to purchase luxury vehicles.

13

Golant engaged in a fraudulent scheme in which he obtained funds from customers, vehicle brokers, lenders, and investors to arrange for the purchase of specific luxury vehicles and diverted those funds to his own personal benefit. Golant obtained funds from third parties by representing that the funds would be used to purchase specific luxury vehicles. Golant and others acting on his behalf, including Blankschein, used the funds to gamble, to pay off gambling debts, to provide funds to professional gamblers to gamble on his behalf, to pay off prior loans, and to satisfy obligations to other clients. On certain occasions, Golant never purchased the specific luxury vehicle and did not return the funds. On other occasions, Golant purported to sell the same luxury vehicle to multiple clients at the same time. On still other occasions, Golant obtained funds from investors, lenders, and clients for the purchase of luxury vehicles that he knew had already been sold and exported. To date, case agents have traced at least $30 million of customer funds Golant obtained that went directly to casinos and professional gamblers, and have identified at least $46 million in funds gambled by Golant and his associates, including Blankschein. To date, the government has identified at least $17 million in losses from victim clients, investors, lenders, and financial institutions.

*__Tax Fraud Conspiracy__*:     In 2013, after Golant had a falling out with his former business partner, Golant approached Blankschein and proposed forming luxury vehicle brokerage businesses together. Since 2011, Blankschein had acted as a straw buyer and then a recruiter of straw buyers for Golant and his businesses. In May of 2013, at Golant's direction, Blankschein formed WI Automotive T.R.US.T. and DOT Automotive. Blankschein was listed as the sole owner and president of both businesses. Blankschein was responsible for opening the business bank accounts and conducted many of the businesses banking transactions. Blankschein was also a major recruiter of straw buyers for WI Automotive T.R.U.S.T. and DOT Automotive. Nonetheless, Golant controlled the day-to-day operations of WI Automotive T.R.U.S.T. and DOT Automotive and directed Blankschein regarding all business decisions. Both Golant and Blankschein had control over multiple business and personal bank accounts that they used to divert corporate receipts, which were supposed to be used to purchase specific luxury vehicles. The business accounts were typically setup by Blankschein and then Golant was either added as a signor at a later date or given access to the accounts online. Golant and Blankschein both diverted corporate funds to gamble and to purchase personal items such as expensive jewelry.

In the spring of 2014, Golant and Blankschein retained the services of S.R. and his business, R&A, to provide bookkeeping and tax preparation services for their businesses. S.R. stated that both Golant and Blankschein were involved in the tax preparation and filing process. R&A employees prepared general ledgers and corporate tax returns (Forms 1120) for WI Automotive T.R.U.S.T. and DOT Automotive based upon business bank account statements provided by Golant and Blankschein. Golant and Blankschein, however, failed to provide R&A with records for all of the bank accounts used by the businesses and, thereby, concealed true income of the businesses.

R&A employees entered the business bank statements into Quicken and then contacted Golant to classify transactions into different expense categories. According to R&A employees, they relied heavily on Golant's representations regarding the disposition of the withdrawals from the business bank accounts when classifying them for tax purposes. Many of the withdrawals from the business bank accounts were, in fact, used to fund Golant's, Blankschein's and others' gambling activity at casinos and to make personal purchases, including Golant's purchases of expensive jewelry; however, Golant told R&A employees that those withdrawals were used to purchase vehicles and that the withdrawals should be deducted as expenses on the corporate tax returns.

Golant and Blankschein further concealed that they were gambling with corporate funds by laundering the funds through multiple bank accounts. For example, when Golant planned gambling trips, he would conduct transfers, or direct Blankschein to conduct transfers, from WI Automotive T.R.U.S.T. or DOT Automotive business bank accounts to bank accounts maintained by third parties. Frequently, the wire transfers of funds for gambling were disguised as payments for luxury vehicles and the memo line of the transfer paperwork would reference a luxury vehicle, e.g., "HSE Range Rover" or "additional Volvo." After receiving the wire transfers, Golant's associates, including Blankschein, would withdraw the transferred funds from the accounts as directed by Golant, and the funds would be used to gamble. For example, on March 16, 2016, Blankschein transferred $200,000 from WI Automotive T.R.U.S.T.'s Citibank to his personal Citibank account, knowing that these funds were received from WI Automotive T.R.U.S.T.'s customers for the purchase of specific luxury vehicles. On that same date, Blankschein withdrew the $200,000 from his personal account and purchased a cashier's check, number 190786978, payable to L'Auberge Casino in Louisiana. Blankschein, Golant, and other co-conspirators gambled with these funds at the L'Auberge casino in Louisiana on March 16, 2016. Golant and Blankschein knew the funds they were diverting from WI Automotive T.R.U.S.T. and DOT Automotive to gamble were corporate receipts and were meant to be used to purchase specific luxury vehicles and Golant and Blankschein failed to disclose to R&A all of the corporate receipts they diverted for gambling activity.

As a result, the tax returns prepared by R&A for DOT Automotive and Wisconsin Automotive T.R.U.S.T. substantially overstated the expenses of the businesses by including as business expenses millions of dollars of corporate funds that Golant and Blankschein diverted to personal use, primarily for gambling activity. R&A prepared tax returns (Forms 1120) for DOT Automotive for the years 2013 and 2014. However, only the 2014 tax return was submitted to the IRS. According to S.R., on August 31, 2015 he e-mailed a copy of the 2014 return to Golant with instructions for Golant to review the return and, if accurate, to sign it. Golant forwarded the return to Blankschein. Blankschein signed the return, sent it to Golant, who then forwarded it to S.R. R&A prepared tax returns (Forms 1120) for Wisconsin Automotive T.R.U.S.T. for the years

15

2013-2015. Only the 2015 return was submitted to the IRS. No tax returns were prepared or filed for either business for 2016.

Based on an analysis of records for bank accounts maintained by Golant, Blankschein, and their businesses, casino records, and records of third parties associated with Golant and Blankschein, the IRS determined that Golant and Blankschein underreported the income for their businesses by more than $12 million. This resulted in a tax loss to the United States Government of more than $5.4 million. The following is a breakdown of the unreported income and tax due and owing:

| | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|
| Unreported income | $194,527.68 | $214,407.73 | $8,040,711.95 | $4,154,761.55 | $12,604,408.91 |
| Unreported taxes | $48,027.00 | $41,548.00 | $3,337,527.00 | $2,049,279.00 | $5,476,381.00 |